UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,
                                  Government.

               -against-

WILFREDO ROSADO,
                                Defendant.
------------------------------------------------------------X

**DECISION & ORDER**
(Denying Defendant's Rule 29 Motion)
S1  21  Cr.  516  (RMB)

## I. Background

On October 4, 2023, a jury found the Defendant "guilty" of Counts Two and Three, i.e., sexual exploitation of a child (production of child pornography) in violation of 18 U.S.C. § 2251(a), and distribution of child pornography in violation of 18 U.S.C. § 2252A). The jury found the Defendant "not guilty" of Counts One and Four, i.e., enticement of a minor and kidnapping of a minor, respectively.

By motion, dated December 21, 2023, the Defense moved pursuant to Rule 29, to dismiss Count Two. By response, dated January 12, 2024, the Government opposes dismissal of Count Two.

## II. Legal Standard

When reviewing a motion under Rule 29, the Court is required to view the evidence "in the light most favorable to the government" and to draw all reasonable inferences in the government's favor. United States v. Autouri, 212 F.3d 105, 114 (2d Cir. 2000). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotations and citation

omitted).

18 U.S.C. § 2251(a) provides that: "Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate commerce or in or affecting commerce . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means . . ."

**The Court, for the reasons stated below, denies the defense motion to dismiss.**

### III. Analysis

Count Two alleged that from at least in or about April 2021, up to and including at least in or about July 2021, in the Southern District of New York and elsewhere, the Defendant "knowingly employed, used, persuaded, induced, enticed, and coerced a minor to engage in sexually explicit conduct, for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and mailed, and the visual depiction was produced and transmitted using material that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and the visual depiction was actually transported and transmitted using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and mailed, to wit, **Rosado recorded a video of himself engaging in sexual intercourse and other sexual activity with [Kaili] a 17 year old girl in Pennsylvania** and [he] transmitted that video via smartphone

messaging application to the 17 year old girl in the Southern District of New York ." (emphasis added).

In order to secure a conviction under § 2251(a), the government must prove beyond a reasonable doubt that: 1) the victim was less than 18 years old; 2) the Defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and 3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce. United States v. Broxmeyer, 616 F.3d 120, 124 (2d Cir. 2010) (internal quotations and citation omitted).

The interstate or foreign commerce requirement "may be satisfied either by creating the images using materials transported in or affecting interstate commerce or by knowing (or having reason to know) that the images will be transported or transmitted in interstate commerce." United States v. Mendez, 35 F.4th 1219, 1221 (9th Cir. 2022).

"Consent of a minor is not a defense to the production charge [18 § 2251(a)]." United States v. Porterfield, 2022 WL 17091256, *5 (W.D.N.Y. Nov. 21, 2022).

The Government proved the § 2251(a) elements at trial. And, the jury's verdict is fully supported by the trial record in that the Defendant used, employed, persuaded, induced, enticed or coerced Kaili to make sexually explicit videos in that she was the subject of the videos and she was under the coercive control of the Defendant at the time the videos were made. The Court and the jury heard testimony of Kaili, the minor victim of the § 2251(a) charge. It is undisputed that Kaili was 17 years old at the time that the Defendant made the videos of the Defendant and Kaili having intercourse and engaging in other sexual activity. It is also undisputed that the visual depictions were transported in interstate commerce in that the Defendant sent the videos to Kaili when she was physically located in Bronx, New York and he

was physically located in Pennsylvania. The videos were sent to Kaili via "WhatsApp" and she viewed them on her phone. See, e.g., Def. Mot. at 3 ("There was no dispute at trial that Kaili was under 18 years old, and that the recording and/or the cell phone on which the videos were recorded travelled in interstate commerce.") The defense contests that "Mr. Rosado 'employed, used, persuaded, induced, enticed, or coerced' Kaili to participate in the recording." Id.

In support of the defense motion, the defense states that "according to Kaili, Mr. Rosado merely asked and Kaili agreed." Id. at 5. By "simply asking Kaili to participate, without taking the further step of seeking to convince her through persuasive tactics or enticement or coercion, Mr. Rosado's conduct did not fall within the purview of [18 U.S.C. § 2251(a)]". Id.

The Government clearly and persuasively - - and beyond a reasonable doubt - - proved at trial that the relationship between the Defendant and Kaili was one in which the Defendant controlled Kaili and her actions through the use of physical and psychological means. See, e.g., Trial Transcript dated September 27, 2023 ("9/27/23 Tr") at 217: 21-23 (Kaili: "He had my phone in his hand and he, like, punched me, he jabbed me in my mouth, and I started crying and I ran to the bathroom."); at 218:8-10 (Kaili: "He was hitting me. We was arguing really bad. And then I'm crying. And then he started crying and apologizing. At that point I just wanted to leave."); at 220:20-23 (Kaili: "He did not want me to separate [from him]. He wanted us to stay together, especially knowing I had his baby, and he told me that I wasn't going to go to the Mommy and Me [program]. I was going back with him."); at 166:14-19 (Kaili: "I did love Angel because there was times that he did things for me, but at the same time, I felt trapped and scared because he knew my past trauma, what I went through with my own family and stuff, about my abuse. And he just decided to take that as an advantage and be violent towards me.");

at 169:16-18 (Kaili: "He had said that he took it [a photo of Kaili's mother's license plate], just in case if I didn't cooperate, to find my mom. He always used my family as leverage over me.")

Kaili testified at trial and she described the abusive sexual relationship with the Defendant (whom she referred to as "Angel") starting when she was 16 years old and Defendant was 34 years old. See, e.g., 9/27/23 Tr at 145:1-4 (AUSA: "How old were you when you were in that relationship?" Kaili: "16." AUSA: "How old was Angel?" Kaili: "34."); at 155:4-6 (AUSA: "When you and Angel started having sex, Kaili, how old were you?" Kaili: "16."); and 161:13-19 (AUSA: "Kaili, ultimately, after Angel found out you were 16 years old, did he end the relationship for good?" Kaili: "No." AUSA: "After this happened, when he found out you were 16 years old, did you continue to live with Angel or did you live with somebody else?" Kaili: "I continued to live with Angel.")

During their relationship, the Defendant was overwhelmingly aggressive and physically violent with Kaili and he threatened to harm Kaili and/or her family members on numerous occasions. See, e.g., 9/27/23 Tr at 162: 16-19 (Kaili: "I started to notice red flags in Angel with his aggression, and it was always his way or no way."); at 162:25-163:1-4 (Kaili: "I started to notice that he would get more aggressive with me with his tone or he would get a little bit violent in my face, threaten to hit me, choke me, stuff like that. I'd be [] against the wall, and I felt like I couldn't do nothing about it."); at 163:17-20 (Kaili: "He [the Defendant] would pull me by my hair sometimes, grab my face really aggressively or shove me in certain ways. He would choke me really hard, stuff like that. Push me against the wall, choke me."); at 169:17-18 (Kaili: "He [the Defendant] always used my family as leverage over me."); at 173:17 (Kaili: "He [the Defendant] smacked me and he burnt me with a cigarette."); at 175:19-25 (Kaili: [The Defendant would say] "That he knows where my daughter [Winter, aged 1] lives and that he was going to

go and hurt my daughter. That he will find where my mom lives or where she works, and he would do stuff to my mom to hurt me. That if I don't do certain things, I don't know, we would - we always got into little arguments. He used to always tell me it was his way or no way, and if I didn't do it his way, it was always a problem."); at 184: 18-25 (Kaili: "I remember I felt his leg or his knee on me, and I was trying to get him off of me, choking me pretty hard, because he was upset because I had lied and he seen that I text my mom. And he had asked me if I had sent her a text, and I said no, I was going to, but I didn't. And he was just cursing at me, degrading me really bad. He was just telling me that if he wanted to, he could spit on me, piss on me."); 195:1-7 (Kaili: [The Defendant would say] "That he was going to come find me and light my family's house up. He was going to come in there, beat the shit out of me. He was going to violate me and show me what type of grown man he is. Just regular stuff to try to intimidate me, especially if I didn't answer the phone. Or he would threaten with me with my daughter and say, I know how to find out. I'll just stick next to Winter, stuff like that."); at 206:12-15 Kaili: [The Defendant had] "Pull me by my hair, spit in my face, smack me, choke me really bad knowing I was pregnant. Threw a phone at my face while I was pregnant. Just abusing me any possible way he could to try to intimidate me to cooperate."); at 217: 21-23 (Kaili: "He [the Defendant] had my phone in his hand and he, like, punched me, he jabbed me in my mouth, and I started crying and I ran to the bathroom"); at 218: 8-10 (Kaili: "He [the Defendant] was hitting me [with a belt] . We was arguing really bad. And then I'm crying. And then he started crying and apologizing. At that point I just wanted to leave.").

Recorded audio messages that the Defendant sent to Kaili threatening to harm her were introduced into evidence. See, e.g., 9/27/23 Tr at 202; 204 and GX 205B; 205V. While Kaili acknowledged that she had loved the Defendant, she felt trapped in her relationship with him.

9/27/23 Tr at 194:4-8 ("I definitely did still love Angel, and plus it was hard because I was pregnant with the baby. But at the same time, I still kind of felt trapped because of the way he treated me, and I did not want to be treated that way, and I feel like I didn't deserve to be treated that way.").

In or about June, 2021, the Defendant took videos of Kaili (who was 17 at the time) and him having sex and engaging in other sexual activity, including oral sex, in a hotel in Pennsylvania. See, e.g., 9/27/23 Tr at 224:22-24 (AUSA: "Kaili, how old were you when Angel asked to take a video of the two of you having sex?" Kaili: "I was 17."); GX 224; 224-10A; 224-11A. Kaili became pregnant and gave birth to the Defendant's child on July 27, 2021, when she (Kaili) was 17 years old. See GX 1203. Kaili confirmed that a screenshot from the video the Defendant took was a screenshot "From me and Angel having sex" and that the Defendant used that video to masturbate. See, 9/27/23 Tr at 259:1; 250:12-20 and GX 224. Kaili also confirmed that the other video was of "Me [Kaili] and Angel giving each other oral sex." See, 9/27/23 Tr at 260:7. And, she confirmed that the Defendant sent her a message referring to the oral sex video that stated: "This me eating you out then you giving me head." 9/27/23 Tr at 262:9-18.

A person "uses" a minor to produce child pornography if the minor serves as the subject of the photography. United States v. Sirois, 87 F.3d 34, 43 (2d Cir. 1996). As set forth in Kaili's testimony and in the videos, as well as in still photos from the videos, Kaili was the subject of the videos created by the Defendant. And, Kaili was used by the Defendant to produce child pornography.

**Expert Witness**

Dr. Chitra Raghavan, a Government witness, who was qualified as an expert in domestic violence and coercive control, also testified at the trial. 10/2/23 Tr at 555:5-8. Among other things, Dr. Raghavan testified that domestic violence is "a broad term that we use to describe a relationship in which one partner uses some form of violence - physical, sexual, or psychological - in order to control the other partner." 10/2/23 Tr at 556:18-21. Dr. Raghavan testified that "when we say 'domestic violence,' we're referring to the relationship. When we say 'cocercive control,' we're referring to the tactics that the abuser uses in order to control the victim." 10/2/23 Tr at 558:16-19.

Dr. Raghavan also testified that "the entirety of abuse, including physical violence, affects the victim in two ways: One is she's afraid. She obeys because she doesn't want to get hit again. She doesn't want to be humiliated again. It also affects her in that it can start to create the beginning of long mental illness - [] depression, trauma, anxiety, substance use - in order to manage the fear, but also the sense of failure that she's in a relationship where she's being harmed by the person that she put her trust in. So simply put, she stays and her mental health gets worse." 10/2/23 Tr at 567:12-21. With regard to victims of domestic violence and coercive control, Dr. Raghavan testified that "the reality is that most women don't say no to sex because they feel obligated to have sex, especially if they are afraid of the abuser, but even when they are not, one possibility is you said no, it didn't work out, so you don't say no again. Another possibility is you sense, you are afraid of the abuser so you dare not say no." 10/2/23 Tr at 605:7-12. Dr. Raghavan also testified that the "biggest effect of successful coercive control on a victim is she stays . . . Because the intent of coercive control is for the woman to be obedient and ultimately stay in the way that he wants her to stay. So the biggest success is she

stays even though it harms her, even though it harms her integrity and the outside world can see that, but she stays." 10/2/23 Tr at 587:7-12.

In sum, the testimony of Kaili, coupled with the testimony of Dr. Raghavan, clearly established that Kaili was in an abusive relationship with the Defendant and that he exercised coercive control over her decisions and actions. The evidence clearly and overwhelmingly established that the Defendant used, persuaded, enticed and induced Kaili into producing the child pornography.

Kaili was 17 years old at the time the videos were made by the Defendant. She could not legally consent to the production of the videos at 17. "Consent of a minor is not a defense to the production charge [18 § 2251(a)]." United States v. Porterfield, 2022 WL 17091256, *5 (W.D.N.Y. Nov. 21, 2022).

## IV. Conclusion and Order

Based upon the foregoing, and the record herein, the Court concludes that the evidence presented, when viewed in the light most favorable to the Government and drawing all reasonable inferences in the Government's favor, supports the jury's reasonable finding of guilt with respect to Count Two.

Accordingly, the Rule 29 motion to dismiss [#124] is respectfully denied.

Dated: New York, New York
       March 6, 2024

*RMB*
_____
RICHARD M. BERMAN, U.S.D.J.